JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE
I. Introduction
Epistar Corporation ("Plaintiff") brought this patent infringement action. It alleges that Defendant Lowe's Home Centers, LLC ("Defendant") has infringed U.S. Patent Nos. 6,346,771 (the '771 Patent), 7,560,738 (the '738 Patent), 8,492,780 (the '780 Patent), 8,587,020 (the '020 Patent), and 8,791,467 (the '467 Patent)[1] . Complaint, Dkt. 1.[2]
The parties filed their Joint Claim Construction and Prehearing Statement on December 18, 2017. Dkt. 70.[3] The parties filed their opening claim construction briefs on December 21, 2017, and their responsive briefs on January 31, 2018. Dkts. 71, 72, 97, 99. A Markman hearing was held on March 8, 2018 and the matter was taken under submission. Dkt. 107. On March 15, 2018, the parties filed a Joint Report regarding matters raised during the Markman Hearing. Dkt. 108. The Joint Report states that the parties were *956 unable to reach agreement on certain disputes that were discussed during the Markman proceedings. Id. Therefore, all disputed claim terms are addressed in this Order.
II. Factual Background
A. The '771 Patent
The '771 Patent is entitled "High Power LED Lamp." The '771 Patent states that it is directed to a "single-chip LED lamp that is up to 250 times more [ ] powerful than a conventional single-chip LED lamp." See '771 Patent at 1:5-9. In one aspect, the '771 Patent discloses an LED chip with semiconductor layers and an active region that generates LED light. Id. at 2:11-17, 2:31-39. The LED chip can also use cavities, reflectors, conductors and/or metal tracks to guide light extraction and enhance the efficiency of the lamp. Id. at 2:16-25, 3:62-4:5-53.
The Complaint alleges that Defendant infringes at least Claim 38 of the '771 Patent. Five of the disputed terms appear in the '771 Patent. Collectively, they appear in its Claims 32, 33, 36, and 38. Claim 38 recites:
38. An LED lamp for generating incoherent visible light, comprising:
a non-semiconductor member having a top face;
a semiconductor structure formed over said top face, said semiconductor structure comprising lower and upper inorganic semiconductor layers of opposite conductivities and an active region generating LED light;
at least one metal conductor over and in electrical contact with part of said lower semiconductor layer;
a top conductor layer formed on and electrically connected to said upper semiconductor layer; and
wherein said semiconductor structure has outer side faces and has several light-extraction surfaces arranged for harvesting light from the semiconductor structure, said light-extraction surfaces being distant from said outer side faces and inclined to said semiconductor layers, LED light propagating in the semiconductor structure being diverted at said light-extraction faces.
'771 Patent at 12:66-13:16. Two representative figures are reproduced below:
*957 '771 Patent, Figs. 2 and 3; see also id. at 2:48-51 (describing Figure 2 as a "plan view of the LED chip in FIG. 1," i.e. , an "LED light source according to an embodiment of the invention" and describing Figure 3 as a "sectional view of a portion of chip 2.").
B. The '020 Patent
The '020 Patent, which is titled "LED Lamps," is a continuation-in-part of the '771 Patent. There are significant overlaps in the specifications of the two patents, including in their diagrams. The '020 Patent discloses single-chip LED lamps and lamps "based on just two LEDs." See, e.g. , '020 Patent at 2:30-31, 2:55-57. The LED lamps may include semiconductor layers with electrically connected conductors and/or tracks to enhance the efficiency of the lamp. Id. at 3:7-10, 6:9-12.
Plaintiff alleges that Defendant infringes at least Claim 1 of the '020 Patent. Three of the disputed terms appear in the '020 Patent, in its Claims 1, 9, and 16. Claim 9 recites:
9. An LED lamp comprising:
a semiconductor structure comprising a lower semiconductor layer having a lower face, an active region, an upper semiconductor layer having an upper face through which at least some light from the active region can escape from the semiconductor structure, a first edge, and a second edge opposite to the first edge;
a first conductor and a second conductor, formed on the upper face;
a track formed on a lower bottom surface lower than the upper face, and between the first conductor and the second conductor;
a first terminal electrically connected to the track; and
a second terminal distant from the first terminal and having a width greater than the first conductor.
'020 Patent at 22:8-23.
C. The '738 Patent
The '738 Patent is titled "Light-Emitting Diode Array Having an Adhesive Layer." The '738 Patent discloses an LED array having at least a substrate, an adhesive layer on the substrate and a plurality of electrically connected epitaxial light-emitting stack layers on the adhesive layer. See id. at Abstract.
The Complaint alleges that Defendant infringes at least Claim 1 of the '738 Patent. Three of the disputed terms appear in the '738 Patent in its Claims 1-3, 8, 13, and 15-17. Claim 1 recites:
*958 1. A light-emitting diode array comprising: a substrate; an adhesive layer formed on the substrate; and a plurality of electrically connected epitaxial light-emitting stack layers disposed on the adhesive layer, each of the epitaxial light-emitting stack layers comprising a P-contact and an N-contact, wherein the P-contact and the N-contact are disposed on the same side of the epitaxial light-emitting stack layer.
'738 Patent at 4:31-37. A representative figure is reproduced below:
'738 Patent, Fig. 1; see also id. at 2:42-44 (describing Figure 1 as "a cross sectional schematic diagram of a light-emitting diode array having an adhesive layer of the prefferred embodiment according to the present invention.")
D. The '780 Patent
The '780 Patent is titled "Light-Emitting Device and Manufacturing Method Thereof." In one aspect, the '780 Patent describes a light emitting device that has a substrate with a particularized sidewall. Id. at 2:4-7. The sidewall comprises a discontinuous structure made by a substantially flat first area and a substantially textured second area. Id. at 2:6-9. This discontinuous structure may enhance the light extraction efficiency of the device. Id. at 2:9-11.
Plaintiff alleges that Defendant infringes at least Claim 1 of the '780 Patent. Two of the disputed terms appear in the '780 Patent, specifically in its Claims 1 and 2. Claims 1 and 2 recite:
1. A light emitting device comprising:
a substrate, wherein the substrate comprises a first major surface, a second major surface, and a sidewall; and
a light emitting stack layer formed on the first major surface of the substrate, comprising a first conductive-type semiconductor layer, an active layer and a second conductive-type semiconductor layer;
wherein the sidewall of the substrate comprises a first area and a second area;
wherein the morphology of the first area is substantially flat and the morphology of the second area is substantially textured.
2. The light emitting device of claim 1, wherein the second area is a convex-concave structure.
'780 Patent at 4:47-60. A representative figure is reproduced below:
*959 '780 Patent, Fig. 4.
III. Analysis
A. Legal Standards
Claim construction is the process of determining the meaning and scope of the patent claims. Markman v. Westview Instruments, Inc. , 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd , 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). It is a matter for the court. Teva Pharms. USA, Inc. v. Sandoz, Inc. , --- U.S. ----, 135 S.Ct. 831, 840-41, --- L.Ed.2d ---- (2015).
"[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp. , 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (internal citations and quotations omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314. "In such circumstances, general purpose dictionaries may be helpful. In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." Id.
"Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.' " Id. (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc. , 381 F.3d 1111, 1116 (Fed. Cir. 2004) ). "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' " Id.
Claim construction "begins and ends" with the words of the claims. Renishaw PLC v. Marposs Societa' per Azioni , 158 F.3d 1243, 1248 (Fed. Cir. 1998). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." Phillips , 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." Id. In addition to the words of the claim(s) being *960 construed, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Id. (citations omitted). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." Id. "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Id. at 1314-15. However, "[c]laim differentiation is a guide, not a rigid rule. If a claim will bear only one interpretation, similarity will have to be tolerated." Laitram Corp. v. Rexnord, Inc. , 939 F.2d 1533, 1538 (Fed. Cir. 1991) (quoting Autogiro Co. of Am. v. United States , 384 F.2d 391, 404 (Ct. Cl. 1967) ).
"[C]laims must be construed so as to be consistent with the specification, of which they are a part." Merck & Co. v. Teva Pharms. USA, Inc. , 347 F.3d 1367, 1371 (Fed. Cir. 2003). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Phillips , 415 F.3d at 1313. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' " Id. at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc. , 90 F.3d 1576, 1582 (Fed. Cir. 1996) ).
"[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." Phillips , 415 F.3d at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." Id.
Despite the importance of a specification, limitations of the described embodiments of the invention must not be read into the claims. The Federal Circuit "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." Id. at 1323. Conversely, "an interpretation [which excludes a preferred embodiment] is rarely, if ever, correct and would require highly persuasive evidentiary support." Vitronics , 90 F.3d at 1583.
The prosecution history is also relevant intrinsic evidence. Although "the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation" and for this reason "often lacks the clarity of the specification," it can nonetheless "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Phillips , 415 F.3d at 1317.
"Although [the Federal Circuit has] emphasized the importance of intrinsic evidence in claim construction, [it has] also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.' " Id. (quoting Markman , 52 F.3d at 980 ). The use of "technical words or phrases not commonly understood" may *961 give rise to a factual dispute, the determination of which will precede the ultimate construction. Teva , 135 S.Ct. at 838, 849.
B. Agreed Claim Constructions
The parties previously agreed upon a construction for the following term:
 Claim Term Agreed Construction " morphology" ('780 patent, Claims 1-7) "the shape and distribution of material at a surface" 
On March 5, 2018, the parties also filed a stipulation regarding the proposed constructions of three previously disputed claim terms. See Dkt. 106. The parties stipulated as follows:
 Claim Term Agreed Construction " plurality of light-extraction cavities" ('771 patent, Claims 32, 33, 36) "more than one cavity surrounded by at least two inclined or curved surfaces for extracting light" " top conductor layer" ('771 patent, Claims 32, 33, 36, 38) Plain and ordinary meaning, no construction necessary " several light-extraction surfaces" ('771 patent, Claim 38) Plain and ordinary meaning, no construction necessary 
C. Disputed Terms
1. "Conductor" ( '771 patent, Claims 32, 38; '020 patent, Claims 1, 9, 16)
 Plaintiffs' Construction Defendant's Construction Plain and ordinary meaning, no construction necessary "conductive meandering track that changes its direction" 
The term "conductor" appears in independent Claims 32 and 38 of the '771 Patent, and independent Claims 1, 9, and 16 of the '020 Patent. For example, Claim 32 of the '771 Patent recites:
32. An LED lamp for generating incoherent visible light, comprising:
a non-semiconductor member having a top face;
a semiconductor structure formed over said top face, said semiconductor structure comprising lower and upper inorganic semiconductor layers of opposite conductivities and an active region generating LED light;
at least one metal conductor in electrical contact with said lower semiconductor layer;
a top conductor layer formed on and electrically connected to said upper semiconductor layer; and
wherein said semiconductor structure has outer side faces and has a plurality of light-extraction cavities for harvesting light from the semiconductor structure, said light-extraction cavities extending from the top surface of said upper semiconductor layer and cutting into at least one of said semiconductor layers, and being distant from said outer side faces, LED light propagating in the semiconductor structure being diverted at said light-extraction cavities.
'771 Patent, Claim 32 (emphasis added). Claim 9 of the '020 Patent recites:
9. An LED lamp comprising:
*962 a semiconductor structure comprising a lower semiconductor layer having a lower face, an active region, an upper semiconductor layer having an upper face through which at least some light from the active region can escape from the semiconductor structure, a first edge, and a second edge opposite to the first edge;
a first conductor and a second conductor , formed on the upper face;
a track formed on a lower bottom surface lower than the upper face, and between the first conductor and second conductor ;
a first terminal electrically connected to the track; and
a second terminal distant from the first terminal and having a width greater than the first conductor .
'020 Patent, Claim 9 (emphasis added).
The primary dispute is whether the claim terms "conductor" and "track" have the same meaning. Defendant argues that they do inasmuch as they are used interchangeably in the '771 and '020 Patents. Dkt. 71 at 9. Plaintiff disagrees, and contends that "the specification indicates that a track is comprised of a plurality of conductors." Dkt. 99 at 2.
The '020 Patent is a continuation-in-part of the '771 Patent. The parties do not expressly dispute that the claim terms "track" and "conductor" should be construed consistently across the two patents. See generally Dkt. 71 at 8-11; Dkt. 72 at 4-8 (referring to terms as they appear in both patents). This presumption is consistent with Omega Eng'g, Inc. v. Raytek Corp. , 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("we presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning"). See also In re Rambus Inc. , 694 F.3d 42, 48 (Fed. Cir. 2012) (construing "memory device" based on consistent usage of the term in the patent at issue and two related patents).
The terms "conductor" and "track" appear in the specifications of both patents. The term "conductor" appears in the claims of both patents. "Track" only appears in the claims of the '020 Patent. Claim 9 of the '020 Patent states, inter alia , "a track formed on a lower bottom surface lower than the upper face, and between the first conductor and the second conductor." "There is an inference ... that two different terms used in a patent have different meanings." Comaper Corp. v. Antec, Inc. , 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("drive bay" and "drive bay slot" have different meanings). The terms "track" and "conductor" are both present in the same clause of Claim 9 of the '020 Patent. This supports a finding that the two terms are not synonymous. See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp. , 93 F.3d 1572, 1579 (Fed. Cir. 1996) ("If the terms "pusher assembly" and "pusher bar" described a single element, one would expect the claim to consistently refer to this element as either a "pusher bar" or a "pusher assembly," but not both, especially not within the same clause [of a claim]. Therefore, in our view, the plain meaning of the claim will not bear a reading that 'pusher assembly' and 'pusher bar' are synonyms.").
This conclusion is also supported by the specification of the patents. For example, both the '771 and '020 Patents state,
Conductors 16 comprise meandering tracks. Thus, for example, conductors 16a , 16b together constitute a meandering track, i.e. a track that changes its direction. Conductors 16c , 16d constitute another meandering track. Conductor tracks 16 have node points 50 that join a plurality of tracks together.
'771 Patent at 4:17-22; '020 Patent at 6:19-23.
*963 Defendant argues that the sentence "conductors 16 comprise meandering tracks" is a lexicographic definition showing that the patentee intended that the terms "conductor" and "track" be used synonymously. See Dkt. 71 at 8-9. However, to serve as a lexicographic definition, the patent applicant must demonstrate a clear intention to define a term. Thorner v. Sony Computer Entm't Am. LLC , 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning.") (quoting CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002) ). The phrase "[c]onductors 16 comprise meandering tracks" uses both the plural "conductors" and the plural "meandering tracks." Therefore, on its face, this statement is inconclusive as to whether a single conductor is the same as a single meandering track.
Notably, although the '771 and '020 Patent specifications alternate in the use of the phrases "conductors 16 ," "conductor tracks 16 ," and "track 16 " to describe label 16, they also generally refer to "conductors " (emphasis added) and "track." This distinction between singular and plural words is significant. Although there are some exceptions as to this distinction, this general usage suggests that a track 16 is comprised of multiple conductors 16 . The statement in the specification that "conductors 16a , 16b together constitute a meandering track" also supports this interpretation. Indeed, this sentence, which appears immediately after "conductors 16 comprise meandering tracks," would not make sense if Defendant's interpretations of "conductor" and "track" were adopted. Specifically, this portion of the specification would indicate that conductor 16a and conductor 16b together form a meandering track. Defendant argues that 16a and 16b are merely "segments" or "subsections" of "conductor structure 16 ." Dkt. 97 at 4. This argument is not consistent with the express reference in the specification to 16a and 16b as "conductors" rather than conductor segments.
With respect to Defendant's reference to "conductor structure 16 ," the '020 Patent specification refers to a singular "conductor 16 " in only two places. See, e.g. , '020 Patent at 6:22-26 ("Conductor tracks 16 have node points 50 that join a plurality of tracks together. The width of conductor 16 can be 5-20 μm and its thickness can be 0.5 μm or more. Conductors 16 can be formed by the same process steps as are used for making pad 11 ..."); id. at 8:35-37 ("Conductor 16 between a pair of elements E provides a low resistance connection between the pair."). Given the many other portions of the specification relying on "conductors 16 " plural and "track 16 " singular, including the disclosure of conductors 16a and 16b , these two references to "conductor 16 " singular do not change the analysis.
The '771 and '020 Patent specifications also refer to an additional conductor 20 , which is not described as a track: "Manufacture of a light source unit based on the chip of FIG. 2 or FIG. 5 ... includes the steps, in order, of: ... providing insulation for conductor 20 in the case of FIG. 5; forming tracks 19 ...." '771 Patent at 7:59-8:2; '020 Patent, 9:51-64. Figure 5 depicts conductor 20 as a single, straight line.
*964 '771 and '020 Patent, Fig. 5 (annotations added).
At the hearing, Defendant argued that conductor 20 is also a meandering track, but that the changes in its direction cannot be seen in the particular perspective view of the figure that is presented in the patent. Defendant characterized conductor 20 as an escalator moving up at a particular angle between two stacked semiconductor layers. Thus, Defendant argues that conductor 20 changes direction in the vertical plane. However, there is no disclosure in the specification that conductor 20 is not a straight line, albeit one that is presented at an angle. Defendant's argument also fails because it would require an unreasonably broad understanding of the phrase "change direction." Thus, the phrase would have to include any situation where a conductor is not perfectly situated on the same plane as the semiconductor layers.
When viewed together with this other disclosure in the specification and claims, the statement "conductors 16 comprise meandering tracks" alone is insufficient to represent a lexicographic definition of the term "conductor" that equates "conductor" and "track." On the current record, a person of skill in the art would not have sufficient notice that the patent applicant intended to limit the term "conductor" in this way.
The parties do not dispute that the term "conductor" relates to a conductive material. See, e.g. , Dkt. 72 at 4-5. Defendant's argument that "track" and "conductor" are synonymous is rejected. Defendant offers no additional, independent basis as to why a "conductor" would constitute a "conductive meandering track." Accordingly, no construction of the term "conductor" is necessary.
2. "Track" ( '020 patent, Claims 1, 9, 16)
 Plaintiffs' Construction Defendant's Construction Plain and ordinary meaning, no construction necessary "conductive meandering track that changes its direction" 
*965 The distinction between "track" and "conductor" was discussed in the analysis of the claim term "conductor." The parties' remaining dispute as to the claim term "track" concerns whether the term must be construed to require "meandering" and "changes [in] direction," as Defendant asserts, or should be given its plain and ordinary meaning. See Dkt. 71 at 10-11; Dkt. 72 at 6.
The '020 Patent claims refer to tracks, but do not include any language that supports the view that a track must meander or change direction. The claims are at best inconclusive on this issue.
In one portion, the '020 Patent specification states, "conductors 16a , 16b together constitute a meandering track, i.e. a track that changes its direction." '020 Patent at 6:20-21. Defendant argues that this disclosure and the related use of the term "i.e." shows that tracks must meander. See Dkt. 71 at 10. However, as Plaintiff observes, the phrase "i.e., a track that changes its direction" describes a "meandering track," not simply a "track." Dkt. 99 at 2. Stated differently, the specification would reflect that a "meandering track" is a type of track, but not that all disclosed tracks must meander. Defendant's proposal would narrow the meaning of the claim term "track." Defendant, however, has failed to prove that the patentee acted as its own lexicographer, or that in doing so it provided a definition that gave express notice that all disclosed tracks must meander or change direction.
Further, in referring to Figure 2, the '020 Patent specification states, "[c]onductor tracks 19 have node points 22 that join a plurality of tracks together." '020 Patent at 6:35-36. Figure 2, in turn, depicts a track 19 that is straight and connects to a node point 22 . Construing the term "track" generally to require a "meandering track that changes its direction," as Defendant proposes, would exclude this embodiment in the specification.
'020 Patent, Fig. 2 (annotations added).
For the foregoing reasons, no construction of the term "track" is necessary.
*966 3. "Semiconductor structure" ( '771 patent, Claims 32, 33, 38; '020 patent, Claims 1, 9, 16)
 Plaintiffs' Construction Defendant's Construction Plain and ordinary meaning, no construction necessary "structure comprised of semiconductor layers suitable for providing a high-power single-chip LED lamp without clustering" 
The parties have two disputes about the term "semiconductor structure:" first, whether it should be construed to include the phrase "comprised of semiconductor layers;" and second, whether it should be construed in a manner requiring that the structure is "suitable for providing a high-power single-chip LED lamp without clustering." As the parties did with respect to their dispute over the term "conductor," their premise is that the term "semiconductor structure" should be construed in the same way as to the '771 and '020 Patents. See generally , Dkt. 71 at 6-8; Dkt. 72 at 8-9.[4]
Defendant's proposed construction "comprised of semiconductor layers" is redundant given the language used in the claims. Claims 32 and 38 of the '771 Patent and Claims 1, 9, and 16 of the '020 Patent specify that the semiconductor structure comprises one or more layers. For example, Claim 1 of the '020 Patent recites, inter alia , "[a]n LED lamp comprising: a semiconductor structure comprising a lower semiconductor layer having a lower face, an active region, an upper semiconductor layer having an upper face, a left edge, and a right edge ..."
With respect to the phrase "a high-power single-chip LED lamp without clustering," Plaintiff argues that there is nothing in the intrinsic record that supports a finding that this claim phrase should be restricted to a "single chip, lack[ing] clustering, or high power." Dkt. 72 at 8-9. Plaintiff cites certain embodiments of the '020 Patent that refer to LED lamps with two chips, contrary to limiting the structure to a single-chip LED. Id. at 9 (citing '020 Patent, 1:36-39). Defendant responds that both the specification and prosecution history of the patents disparage small, clustered LED lamps. For this reason, it argues that this claim term should be limited to exclude clustered LEDs. Dkt. 71 at 7; Dkt. 97 at 1-2. The claims do not include language that supports Defendant's narrower proposed construction for "semiconductor structure." Ultimately, the language of the claims is inconclusive as to the scope of the term.
As to the specification, the '020 Patent and '771 Patent each states, "[a]n object of the present invention is to provide a single-chip LED lamp that avoids or reduces the need for clustering." '020 Patent 2:30-31; '771 Patent 1:58-60. Defendant highlights similar language in the '771 Patent, which describes "an object of the present invention" as providing a "single-chip LED lamp." See, e.g. , '771 Patent at 1:5-6 ("The present invention is related to single-chip *967 LED lamps"); see generally , '771 Patent at 1:58-2:44. However, this language relates to LED lamps, not semiconductor structures. The parties have not requested construction of the term LED lamp, and it would be inappropriate to import Defendant's proposed limitations into the "semiconductor structure" term.
At the hearing, Defendant argued that the term "semiconductor structure" is properly construed to include these limitations because they relate to the properties of that structure. Plaintiff responded that the claim language itself sets forth the structural properties of the semiconductor structure, including the claim language to the effect that a semiconductor structure is comprised of a lower semiconductor layer, upper semiconductor layer and active region. Plaintiff's position is more persuasive because each of Defendant's proposed limitations relates to the properties of LED lamps overall, not to the semiconductor structure within those LED lamps.
Because the parties have not presented specific arguments with respect to the claim term "LED lamp," it is inappropriate to construe that term. However, based on evidence that has been submitted by the parties, it is apparent that the '771 and '020 Patents would not be limited solely to LED lamps "without clustering," as Defendant proposes. Instead, both patent specifications refer to LED lamps that "avoid or reduce the need for clustering." '020 Patent 2:30-31 (emphasis added); '771 Patent 1:58-60 (emphasis added). Similarly, Defendant cites a portion of the prosecution history, i.e., "the invention enables a reduction or even avoidance of the need for clustering of known lamps." See Dkt. 71 at 7 (quoting Dkt. 71 Ex. M at 13). For all of these reasons, Defendant's arguments fail as to disparagement and disavowal of clustered LEDs. Thorner , 669 F.3d at 1366.
As to whether the '771 and '020 Patents are limited to single-chip LED lamps, the '771 Patent states that "the present invention is related to single-chip LED lamps" or "[a] further object of the present invention is to provide a single chip LED lamp." See, e.g. , '771 Patent at 1:5-6; 1:58-59; 1:61-62; 2:1-2; 2:7-8. The '020 Patent, however, is broader. It provides that "[a] purpose of the present invention is to provide a single-chip LED lamp that is up to 250 times more powerful than a conventional single-chip LED lamp. Another purpose of the invention is to provide a two-chip white LED lamp that is up to 250 times more powerful than a conventional single-chip white LED lamp." '020 Patent at 1:33-39. "[I]t is certainly possible that a clear and unmistakable disavowal in an incorporated patent is no longer so when placed in the context of the disclosure of the host patent." X2Y Attenuators, LLC v. Int'l Trade Comm'n , 757 F.3d 1358, 1363 (Fed. Cir. 2014). Defendant has advanced a persuasive argument as to whether the invention of the '771 Patent should be limited to single-chip LED lamps. Nevertheless, whether the inventions of the '771 and '020 Patents should both be limited to single-chip LED lamps is not addressed in this Order.
For the foregoing reasons, no construction is necessary for the claim term "semiconductor structure."
4. "Plurality of electrically connected epitaxial light-emitting stack layers" ( '738 patent, Claims 1-3, 8)
*968 Plaintiffs' Construction Defendant's Construction "light-emitting epitaxial stack layers wherein the P-contact of a first light-emitting epitaxial stack layer is connected to the N-contact of the adjacent light-emitting epitaxial stack layer" "at least two semiconductor structures, wherein each structure comprises at least one semiconductor layer overlying at least another semiconductor layer and wherein each structure is capable of being connected to an electrical current to emit light" 
"Light-emitting stack layer" ( '738 patent, Claims 1,13, 15-17)
 Plaintiffs' Construction Defendant's Construction Plain and ordinary meaning, no construction necessary "a semiconductor structure comprising at least one semiconductor layer overlying at least another semiconductor layer, wherein the structure is capable of emitting light" 
Both parties have discussed collectively the terms "plurality of electrically connected epitaxial light-emitting stack layers" and "light-emitting stack layer." Both terms appear in Claim 1 of the '738 Patent. It recites:
1. A light-emitting diode array comprising: a substrate; an adhesive layer formed on the substrate; and a plurality of electrically connected epitaxial light-emitting stack layers disposed on the adhesive layer, each of the epitaxial light-emitting stack layers comprising a P-contact and an N-contact, wherein the P-contact and the N-contact are disposed on the same side of the epitaxial light-emitting stack layer .
'738 Patent, Claim 1 (emphasis added). The principal disputes between the parties concern the meaning of the following terms: (i) "stack layer"; (ii) "epitaxial"; and (iii) "electrically connected." They are discussed in this sequence.
a) "Light emitting stack layer"
Defendant has not explained expressly why it contends that its proposed construction -- "a semiconductor structure comprising at least one semiconductor layer overlying at least another semiconductor layer" -- is appropriate. Defendant argues that claim construction is necessary because there should be a "basis upon which a jury would be able to determine the ordinary meaning of the inconsistent terms 'stack' and 'layer." Dkt. 97 at 10. Although Plaintiff challenged Defendant's use of the term "overlying" in its proposed construction, Defendant did not respond in its responsive brief.
At the hearing, both counsel stated that much of Defendant's concerns regarding this term stem from the phrase "stack layer," which is used in the patent in two contexts: (i) simply a "stack layer" and (ii) in connection with the phrase "light-emitting stack layer." The parties agreed that the term "stack layer" is used differently in these two contexts. Plaintiff argued that a "stack layer" may be a single material layer. See, e.g. , '738 Patent at 2:65-3:2 (stating in reference to Figure 1, "a first conductive semiconductor stack layer 14 formed on the transparent conductive layer 13 , a light-emitting layer 15 formed on the first semiconductor stack layer 14 , a second conductive semiconductor stack layer 16 formed on the light-emitting layer 15 .") However, in the context of "light-emitting stack layer," as Plaintiff explained *969 in its responsive brief, "[t]he specification is clear that a light emitting stack layer comprises multiple layers of materials to emit light." Dkt. 99 at 7; see '738 Patent at 1:22-25 (in describing an earlier embodiment, stating "a Group III-V nitride light-emitting stack layer is formed on an insulating substrate. A portion of the stack layer is etched away to form a trench, and in result to form the LED array ..."). Defendant acknowledged that the patent uses the phrase "stack layer" in these ways, but preserved a future challenge under 35 U.S.C. § 112.
A review of Defendant's proposed construction and Plaintiff's responsive arguments shows that the parties agree that the '738 Patent contemplates that a "light emitting stack layer" comprises multiple layers of material. As Defendant notes, this may not be readily apparent to a fact-finder reading the claims. Therefore, the term " light emitting stack layer" is construed as "a light emitting stack of multiple semiconductor layers"
b) "Epitaxial"
Plaintiff argues that the term "epitaxial" refers to "a stack layer having the same orientation as the layer on which it was grown." Dkt. 72 at 19. Plaintiff, citing dictionary definitions, adds that "[t]his is well understood to a person of ordinary skill in the art." Id. (citing Dkt. 72, Exs. 10-12.) Plaintiff contends that Defendant's proposed construction would improperly read the word "epitaxial" out of the claims. Id. at 20.
Defendant responds that Plaintiff's submitted dictionary definitions "are consistent with each other and highlight a fatal flaw in the '738 patent." Dkt. 71 at 23. Specifically, Defendant argues that "the 'stacks' recited in Claims 1 and 13 of the '738 patent do not have a crystal orientation relationship with the underlying materials (i.e. , the adhesive layer 12 and the substrate 10 )." Id. Plaintiff replies that Defendant does "not appear to dispute the actual definition of the term." Dkt. 99 at 8. Plaintiff then adds that, "[n]othing in the claim language or the specification supports that 'epitaxial' requires the 'light-emitting stack layer' be grown on the adhesive layer as [Defendant] suggests." Id. At the hearing, Defendant clarified that it was seeking to exclude the term "epitaxial" from its construction of the term "epitaxial light-emitting stack layers" because it believes the term "epitaxial" is a product-by-process limitation.
"[C]laims are interpreted with an eye toward giving effect to all terms in the claim." Bicon, Inc. v. Straumann Co. , 441 F.3d 945, 950 (Fed. Cir. 2006). Defendant's arguments regarding whether "epitaxial" is a product-by-process limitation are premature. A product-by-process claim defines a product in terms of the process used to produce that product. "It has long been the case that an old product is not patentable even if it is made by a new process." Amgen Inc. v. F. Hoffman-La Roche Ltd , 580 F.3d 1340, 1366 (Fed. Cir. 2009). Consequently, [i]n determining validity of a product-by-process claim, the focus is on the product and not the process of making it." Id. at 1369. However, in determining infringement of the claim, "the focus is on the process of making the product as much as it is on the product itself." Id. at 1370. Defendant does not discuss the relevance of the "epitaxial" claim limitation with respect to the patent infringement analysis. Instead, it directs arguments to a future invalidity analysis. On this record, there is no basis to read the term "epitaxial" out of the meaning of this claim limitation. Therefore, the dispute as to whether this limitation is a product-by-process limitation is deferred.
The parties do not expressly dispute the plain and ordinary meaning of the term "epitaxial." Accordingly, it is not appropriate *970 to exclude it from the construction of the term "epitaxial light-emitting stack layers."
c) "Electrically connected"
Plaintiff argues that particular embodiments in the patent support construing "electrically connected" to require "at least two 'epitaxially light-emitting stack layers' to be electrically connected to each other." Dkt. 72 at 20. Plaintiff also argues "that there is an electrical connection between the layers is consistent with the way the patentee repeatedly used the phrase during prosecution to distinguish a reference ..." Id. at 21. Defendant argues that the word "connected" "seemingly requires little additional gloss" and "is narrowed by a specific type of connection - electrical." Dkt. 71 at 23. Defendant then argues that the term should be construed to mean "capable of being connected" because of "the reality that a device may still be found to infringe (or anticipate) regardless of whether the device is actively being used to generate light at the time of analysis." Id. Defendant also challenges the specific language in Plaintiff's proposal requiring a connection between "the P-contact of a first light-emitting epitaxial stack layer ... to the N-contact of the adjacent light-emitting epitaxial stack layer." Id. at 23. Defendant argues that, "the specification of the '738 patent encompasses a broader range of interconnections than Epistar proposes." Id. at 24 (citing '738 Patent at 3:26-32). Plaintiff responds that, "[n]owhere in the intrinsic record does the patent contemplate a connection other than serial between two light-emitting stack layers." Dkt. 99 at 9.
Plaintiff does not argue that the patent applicant acted as its own lexicographer in using the phrase "electrically connected." Instead, Plaintiff seeks to limit the meaning of this claim term based on the particular embodiment disclosed in the '738 Patent at Figure 1. Courts have "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." Phillips , 415 F.3d at 1323. In addition, the patent specification refers to concepts of "parallelly" and "serially" connected LED arrays. If the applicant intended to limit the scope of "electrically connected" as it appears in the claims to a particular type of electrical connection between adjacent light emitting stack layers, it would have been appropriate for the patent applicant to have stated this in the claims. See, e.g. , '738 Patent, Claim 13. Instead, the patent applicant relied on the general phrase "electrically connected" in Claim 1. Based on an assessment of these elements as well as the claim language and specification, there is not a sufficient basis to find that the applicant intended to depart from the plain and ordinary meaning of this phrase. Consistent with this conclusion is the statements that Plaintiff's counsel made at the hearing, i.e., "the plain and ordinary of electrically connected is fine," but what is electrically connected are two or more epitaxial light emitting stack layers, as stated in the claim.
Defendant's argument that the phrase should be construed as "wherein each structure is capable of being connected to an electrical current to emit light," is unpersuasive. Claim 1 specifically recites: "plurality of electrically connected epitaxial light-emitting stack layers disposed on the adhesive layer." Therefore, it would be inappropriate to read "capability" into the claims. Defendant's related argument is persuasive, i.e., that a product should be understood to infringe (or invalidate) whether or not the device is actually being used. Indeed, Plaintiff does not argue that electricity must always be actively flowing through the connection between the two layers in order to support a claim of infringement. Defendant's proposed "capability"
*971 construction phrase, however, would not provide a meaningful limitation for this claim term and could create ambiguity.
At the hearing, Defendant's counsel urged that an affirmative construction be adopted for the term "electrically connected" notwithstanding Defendant's view that the term should be understood by its plain and ordinary meaning. Plaintiff's argument that "electrically connected" requires a P to N connection between adjacent light emitting stack layers has been rejected, as have Defendant's arguments that the term should be construed to include "capability." Without additional context for the parties' dispute and proposed constructions, it would be inappropriate to construe the phrase "electrically connected" in the context of the claims.
d) Conclusion
The term "light-emitting stack layer" is construed as "a light emitting stack of multiple semiconductor layers" and the term " plurality of electrically connected epitaxial light-emitting stack layers" is construed as "two or more epitaxial light-emitting stack layers that are electrically connected."
5. "A top surface" and "The top surface" ( '738 patent, Claim 13)
 Plaintiffs' Construction Defendant's Construction Plain and ordinary meaning, no construction necessary "the surface opposite the substrate" 
The claim terms "a top surface" and "the top surface" appear in independent Claim 13 of the '738 Patent. Claim 13 recites:
13. A light-emitting diode array comprising: a substrate; an adhesive layer formed on the substrate, the adhesive layer comprising a top surface and a plurality of adhesive regions disposed on the top surface ; a first light-emitting stack layer formed on a first adhesive region of the plurality of adhesive regions, the first light-emitting stack layer comprising a top surface , a first first-conductivity contact region formed on the top surface , and a first second-conductivity contact region formed on the top surface ; a first first-conductivity conductive contact formed on the ffirst [sic ] first-conductivity contact region; a first second-conductivity conductive contact formed on the first second-conductivity contact region; a second light-emitting stack layer formed on a second adhesive region of the plurality of adhesive regions, the second light-emitting stack layer comprising a top surface , a second first conductive contact region formed on the top surface , and a second second-conductivity contact region formed on the top surface ; a second first-conductivity conductive contact formed on the second first-conductivity contact region; a second second-conductivity conductive contact formed on the second second-conductivity contact region; and a first conductive line for electrically connecting either of the conductive contacts of the first light-emitting stack layer to either of the conductive contacts of the second light-emitting stack layer.
'738 Patent, Claim 13 (emphasis added). The parties dispute whether the term should be construed to require that the "top surface" be the surface "opposite the substrate." See Dkt. 72 at 17-18, Dkt. 71 at 25.
Defendant argues that the term "top surface" is based on an incorrect assumption, i.e., that "an LED and an adhesive layer have an innate 'top' surface." Dkt. 97 *972 at 8; see also Dkt. 71 at 25. Defendant also takes issue with Claim 13, arguing that it "was written with the sole purpose of rendering the 'invention' incomprehensible to a lay jury or even a person having ordinary skill in the art." Dkt. 71 at 25.
Plaintiff responds that the term "top surface" should be given its plain and ordinary meaning, which is "a surface on the top." Dkt. 72 at 17. Plaintiff further argues that LEDs have a "natural top down orientation" which is "consistently disclosed by the specification." Dkt. 99 at 6. Plaintiff adds that construing the term as the layer "opposite the substrate" would add ambiguity because both surfaces of the "adhesive layer" could be considered "opposite the substrate." Id. at 18.
Plaintiff's argument that LEDs have a "natural top down orientation" is unpersuasive. Although the figure in the '738 Patent shows the substrate at the bottom of the LED, it is simple to turn the LED upside down. See '738 Patent, Fig. 1. In this orientation, the "top surface" Plaintiff points to will immediately become a surface on the bottom. See Dkt. 72 at 17.
As Plaintiff notes, Defendant's proposed construction may add ambiguity to the term. For example, "opposite the substrate" could generally mean the surface on the other side of the substrate. In Figure 1 of the '738 Patent, this could be the surface Plaintiffs are referring to (the surface between layers 12 and 13 ), but it could also be the other surface of the layer (the surface between layers 12 and 10 ). Plaintiff illustrates this uncertainty in an annotated patent figure:
Dkt. 72 at 18. Despite this supposed uncertainty, both parties appear to agree that "the top surface" is the surface annotated by Plaintiff in a separate image:
*973 See id. at 17; see also Dkt. 97 at 8 (depicting the same annotated figure). At the hearing, both parties agreed in part with the tentative proposed construction of this term as "the surface farthest from the substrate."
The claim term "a top surface"/"the top surface" is construed as "the surface farthest from the substrate."
6. "Disposed on the same side of" ( '738 patent, Claim 1-3, 8)
 Plaintiffs' Construction Defendant's Construction Plain and ordinary meaning, no construction necessary "located on the side opposite the substrate" 
Plaintiff presented arguments regarding the term "disposed on the same side of" in its opening brief. See Dkt. 72 at 15-17. Defendant did not, but did so in its responsive claim construction brief. See Dkt. 97 at 7-8. Both parties acknowledge that the phrase was "not among those identified by [Defendant] as most significant." Id. at 7; see also Dkt. 72 at 16. At the hearing, Defendant stated that it was simply seeking to preserve the issue until later if it became significant. Because the parties did not provide comprehensive briefing about this term, and have not advocated for a construction at this time, the term is not construed at this time.
7. "Substantially flat" ( '780 patent, Claim 1)
 Plaintiffs' Construction Defendant's Construction Plain and ordinary meaning, no construction necessary "is essentially smooth and even" 
The term " substantially flat" appears in Claim 1 of the '780 Patent. Claim 1 recites:
1. A light emitting device comprising:
a substrate, wherein the substrate comprises a first major surface, a second major surface, and a sidewall; and
a light emitting stack layer formed on the first major surface of the substrate, comprising a first conductive-type semiconductor layer, an active layer and a second conductive-type semiconductor layer;
wherein the sidewall of the substrate comprises a first area and a second area;
*974 wherein the morphology of the first area is substantially flat and the morphology of the second area is substantially textured.
'780 Patent, Claim 1 (emphasis added).
Defendant asserts that the parties dispute the meaning of the term "substantially flat." See Dkt. 97 at 6. Defendant does not describe that dispute. Instead, Defendant simply faults Plaintiff for arguing that no construction of the term is necessary. Id. ("Because [Plaintiff] did not [ ] provide a construction [ ] in its S.P.R. 3.2 disclosures, what [Plaintiff] thinks 'flat' would mean if not 'smooth and even' is unknown.") Plaintiff does not dispute the actual meaning of "flat," but objects to Defendant proposing two commonly understood terms to interpret other commonly-understood ones. Defendant has not argued that a fact finder would be unable to understand the phrase "substantially flat," and instead submits that its proposal is consistent with the term's plain and ordinary meaning and supported by dictionary definitions.
Given that both parties agree that the term should be understood by its well-known, plain and ordinary meaning, no construction of the term is necessary.
8. "Convex-concave structure" ( '780 patent, Claim 2)
 Plaintiffs' Construction Defendant's Construction Plain and ordinary meaning "surface structure having a curved form that bulges inward and outward resembling the interior or exterior of a sphere or cylinder" 
The claim term "convex-concave structure" appears in dependent Claim 2, which depends from Claim 1. Claims 1 and 2 recite:
1. A light emitting device comprising:
a substrate, wherein the substrate comprises a first major surface, a second major surface, and a sidewall; and
a light emitting stack layer formed on the first major surface of the substrate, comprising a first conductive-type semiconductor layer, an active layer and a second conductive-type semiconductor layer;
wherein the sidewall of the substrate comprises a first area and a second area;
wherein the morphology of the first area is substantially flat and the morphology of the second area is substantially textured.
2. The light emitting device of claim 1 , wherein the second area is a convex-concave structure .
'780 Patent, Claims 1 and 2 (emphasis added). The parties dispute whether "convex-concave" should be construed as "having a curved form that bulges inward and outward resembling the interior or exterior of a sphere or cylinder." See Dkt. 72 at 23-25; Dkt. 71 at 17-18.
Plaintiff argues that the term should be given its plain and ordinary meaning and that requiring the structure to " 'resembl[e] the interior or exterior of a sphere or cylinder' [is] not supported by the plain language of the claim." Dkt. 72 at 23. Plaintiff focuses on the shape of this structure and argues that Defendant's construction would improperly limit the meaning of this term to either round or cylindrical forms, when Figure 7 of the '780 Patent specifically discloses a "tapered" shape or a "torpedo shape." Id. at 24.
Defendant responds that, during prosecution of the '780 patent, the examiner cited Figure 2(b) of *975 U.S. Patent Application Publication No. 2008/0128722 ("US 2008/0128722") as the plain meaning of "convex-concave" and that this decision was not challenged by the patentee. Dkt. 97 at 6-7. Defendant argues that Plaintiff should be held to that definition, which is best described by Defendant's proposed construction. Id. Defendant further argues that the torpedo shape described by Plaintiff does not fall within this plain meaning. See id. at 7. Defendant offers dictionary definitions to support its proposed construction. Dkt. 71 at 17-18.
Neither Claim 1 nor Claim 2 recites a convex-concave structure that "resembles the interior or exterior of a sphere or cylinder." See '780 Patent, Claims 1 and 2. Claim 2 simply recites, "wherein the second area is a convex-concave structure." '780 Patent, Claim 2.
With respect to the materiality of the prosecution history of the '780 Patent, Defendant has failed to show that the patent applicant made a clear disavowal of claim scope as to the term "convex-concave" or ascribed to a specific definition of the term "convex-concave." Defendant's argument is based solely on statements by the Examiner, not the patent applicant. Indeed, as Plaintiff notes, during the prosecution, the patent examiner stated in general terms that it appeared that the patent applicant's use of the term "convex-concave" "simply seems to mean, broadly speaking, any shape which is roughly convex-concave including even 'blockish' and not smooth structures that simply have raises and dips as well." See Dkt. 72-19 at 1377. For these reasons, Defendant's argument regarding the prosecution history is unpersuasive.
The term " convex-concave structure" has a well-understood plain and ordinary meaning. Accordingly, no construction is necessary for the claim term "convex-concave structure."
IV. Conclusion
For the reasons stated in this Order, the following constructions are adopted:
 Term Court's Construction "Conductor" ('771 patent, Claims 32, 38; '020 patent, Claims 1, 9, 16) No construction necessary. "Track" ('020 patent, Claims 1, 9, 16) No construction necessary. "Semiconductor structure" ('771 patent, Claims 32, 33, 38; '020 patent, Claims 1, 9, 16) No construction necessary. "Light-emitting stack layer" ('738 patent, Claims 1,13, 15-17) "a light emitting stack of multiple semiconductor layers" "Plurality of electrically connected epitaxial light-emitting stack layers" ('738 patent, Claims 1-3, 8) "two or more epitaxial lightemitting stack layers that are electrically connected" "A top surface" and "The top surface" ('738 patent, Claim 13) "the surface farthest from the substrate" "Substantially flat" ('780 patent, Claim 1) No construction necessary. "Convex-concave structure" ('780 patent, Claim 2) No construction necessary. 
*976 IT IS SO ORDERED.

The parties' Joint Statement stated there are no disputed terms as to the '467 Patent. Dkt. 70 at 2. Therefore, it is not discussed in this Order.

The Complaint initially brought infringement claims against Lowe's Companies, Inc. See Dkt. 1. Pursuant to a stipulation of the parties, Lowe's Companies, Inc. was dismissed without prejudice on July 6, 2017. See Dkt. 27. On January 5, 2018, however, Plaintiff filed a Motion to Amend the Complaint, seeking to re-name Lowe's Companies, Inc. and add L G Sourcing, Inc. as defendants in the current action. Dkt. 75. The Motion to Amend has been fully briefed and was taken under submission on January 31, 2018. See Dkt. 96. At this time, Defendant Lowe's Home Centers, LLC is the only defendant that has participated in the claim construction proceedings.

In the Joint Statement, the parties asserted differing views as to how many disputed claim terms could be identified by Defendant as most significant to the case. See Dkt. 70 at 3-4. Plaintiff argued that since the parties agreed on the two most significant terms, Defendant should be able to identify only four more terms (hypothetically leaving another four that would be considered Plaintiff's potential significant terms). Id. Defendant argued that it should be able to identify up to ten terms as most significant, inclusive of the two agreed upon terms. Id. It appears that the parties' dispute was based on differing interpretations of S.P.R. 3.4.2. Despite this dispute, both parties briefed a total of eleven terms. Each of these eleven terms will be considered in this Order.

In its responsive brief, Defendant notes that particular examples in the '020 Patent"do not appear in the '771 patent and can have no bearing on its meaning." Dkt. 97 at 2. Notwithstanding this statement, Defendant addresses the term "semiconductor structure" with respect to both the '020 and '771 Patents and argues that the term should be construed in the same way as to both patents. See, e.g. , id. ("to the extent the '771 patent disavows clustering, it carries to all patents - such as the '020 patent here - that incorporate its disclosure." (internal citations omitted) ).